[Civ. No. 32698.   Second Dist., Div. Three.   Feb. 27, 1969.]

CITY OF ROSEMEAD, Plaintiff and Respondent, v. RAYMOND R. ANDERSON et al., Defendants and Appellants.

Hansen & Dolle and Hodge L. Dolle, Jr., for Defendants and Appellants.

Richards, Watson & Hemmerling and Glenn R. Watson for Plaintiff and Respondent.

FRAMPTON, J. pro tem.*—

*Statement of the Case*

Plaintiff City of Rosemead, a municipal corporation (hereinafter City), filed an action in eminent domain wherein it acquired two contiguous parcels of real property for a new city hall. Parcel 1 was owned by defendants Raymond R. Anderson and Ida Anderson (hereinafter the Anderson parcel). Parcel 2 was owned by Carl E. Cullen and Marjorie Lee and Marie E. Menzie (hereinafter the Cullen parcel).

Both parcels fronted on Valley Boulevard, a major state highway in the city. The Anderson parcel contained approxi-

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

mately 27,662 square feet and had frontage on Valley Boulevard of 70.31 feet. It was a flag shaped parcel having a depth of 308 feet to Steele Street and with a frontage on Steele Street of 130.31 feet. The Cullens' parcel had frontage on Valley Boulevard of 60 feet and a depth of 208 feet more or less extending southerly therefrom. It contained approximately 12,485 square feet. The Valley Boulevard frontage on each parcel was zoned for commercial use (C-3) to a depth of 150 feet. The remainder of the properties was zoned for single family residential use (R-1).

Both plaintiff's and defendants' expert witnesses agreed that the highest and best use for the properties was commercial, with the R-1 portions having a reasonable probability of being rezoned for parking uses in conjunction with the commercial usage. Both experts also agreed that the existing single gle family residences and other structures on the properties added no value for their highest and best use.

Defendants' expert witness, Mr. Vern Cox, testified that the fair market value of the Anderson parcel as of the date of valuation, January 3, 1967, was $131,400, based on approximately $4.75 per square foot, and the fair market value of the Cullen parcel was $59,300, also based upon approximately $4.75 per square foot.

Plaintiff's expert witness, Mr. Harrison Baker, Jr., testified that the fair market value of the Anderson parcel was $60,300, and the fair market value of the Cullen parcel was $31,500. He assigned a value of $2.80 per square foot to the portion zoned C-3 of each parcel and $1.80 per square foot to the portions zoned R-1.

The jury, by a 10 to 2 verdict, valued the Anderson parcel at $77,400, and the Cullen parcel at $34,900. On the basis of the verdicts the valuation was equal to approximately $2.80 per square foot on each parcel.

During the course of the trial, plaintiff's expert witness, Mr. Baker, testified that he had interviewed various property owners and real estate brokers in the area including a broker named Pearce who had "put together a large 28 to 30-acre complex for a large regional shopping center being developed by Montgomery Ward Company known as Rosemead Square."

After the noon recess on Friday, January 27, 1967, defendants' counsel, in chambers and outside the presence of the jury, moved the court to exclude certain testimony of Baker which was anticipated. The evidence sought to be excluded

was a statement to Baker by Pearce of the average price paid for all of the parcels purchased by Montgomery Ward Company in forming its shopping center located at Rosemead Boulevard and the San Bernardino Freeway. Defendants' counsel further moved the court to exclude any testimony relating to Pearce's discussion with Baker bearing on the price at which Montgomery Ward was offering to lease its property. Both motions were denied. However, plaintiff's counsel assured the court that there would be no evidence elicited as to offers.

Thereafter the following testimony was presented before the jury:

"By Mr. WATSON [Plaintiff's Counsel].

Q. Mr. Baker, have you finished your statement of reasons for your opinion that the highest, as to the highest and best use of the subject property?

A. With one exception I think I have, yes.

Q. All right. Would you complete your answer, please, as to the reasons for your view on the highest and best use.

A. Other than the development across the street that I have testified to that I discussed with Mr. Di Noto where the leases are being carried forth at $2 a square foot on the land, I also discussed with Mr. Victor Pearce—

MR. DOLLE: Just—Excuse me. Just for the record, your Honor, I move to strike the witness's testimony of leases being carried forth at $2 a square foot.

THE COURT: Motion Denied.

MR. DOLLE: Thank you.

THE WITNESS: I also discussed with Mr. Victor Pearce the assemblage of the property in this location. This map, actually, has been altered somewhat in that in the development of this property Hart Avenue has been extended by the developers of this Center southerly and this street, Glendon, has been closed off to make a more orderly type of development and traffic pattern.

The land for this shopping center was assembled at the rate of $2.40 a square foot by Mr. Pearce who delivered this to Montgomery Ward, including his commission, at the rate of $2.65 a square foot, and it's on that basis that leases are being negotiated in this area.

MR. DOLLE: Excuse me again, Mr. Baker. Just for the record, your Honor, move to strike the $2.40 assemblage price of many sales, not exchanged through the appraisal reports, no

foundation laid to show comparability of any of the sales to the subject property.

THE COURT: Very well. I will deny the motion.''

Later Mr. Baker in giving his reason for valuation of the subject properties referred to competitive properties being leased at $2.00 a square foot in one area and $2.65 a square foot in another area. Again, a motion to strike the testimony of Baker relating to the assembled price of the Montgomery Ward property of $2.40 a square foot was denied. Mr. Baker testified further, on cross-examination, that the Montgomery Ward transactions represented the purchase of over one hundred parcels of property and that he had no knowledge of the dates, parties, prices or any other pertinent details of any of the individual sales in the assemblage, nor did he have any specific knowledge of leases in the Montgomery Ward shopping center. He testified also that the leases in Universal Square were on improved properties and he had no knowledge of the value of the improvements, nor of any specifics of a particular lease in Universal Square.

Further, on cross-examination, the following testimony was elicited from Mr. Baker:

''Q. By MR. DOLLE: Did you consider a sale to Montgomery Ward at $2.40 to be a comparable sale to the subject property?

A. No, I did not.

''. . . . . . . . . . .

Q. By MR. DOLLE: Now, you didn't consider it to be a comparable transaction, is that correct?

A. Not as a comparable sale, no.

Q. Then, Mr. Baker, what was your purpose in putting before this jury the figure of $2.40? What was your intent in doing that?

A. My reason for giving merely that background information was as a part of my investigation with Mr. Victor Pearce, one of the knowledgeable brokers in the area, to show the rate of absorption of competitive income-producing properties in the area, namely, any factor that an informed buyer of a property ultimately developing it to its highest and best use for income-producing purposes would investigate the same as he would leases in the Universal Square Center directly opposite the subject property, other competitive properties being offered for lease up and down Valley Boulevard and on Rosemead Boulevard. That was the only reason that I mentioned it. It's another large competitive center competing for tenants in

the Rosemead area, and is a factor, I felt, a buyer of a property buying for investment would consider.

Q. But would not consider any of the sales that went in to make up that average in analyzing it?

A. No, collectively, I think, the figure as I have testified across the street is the figure that would be helpful to a buyer, at least as I would interpret this. And based on my investigation as I feel other buyers would interpret it.

Q. Mr. Baker, isn't an average a dangerous figure if you don't know what goes to make that average?

A. Oh, I'd say that could or could not hold true. An average of anything can be a dangerous thing if you don't know what you are averaging.

Q. There might have been a foreclosure in that assemblage, might there not have?

A. There could have been any number of things.

Q. Very low price, very long time ago, this would tend to bring the average down [?]

A. Low prices and high prices, that's how an average is arrived at. You take everything and arrive at what ultimately the buyer is willing to spend.''

Mr. Baker, when asked if the sellers were informed people, answered ''I don't know.'' When asked if the buyers (Montgomery Ward Company) were informed people, he answered ''The buyers I would say were.''

The appellants urge that it was prejudicial error for the court to deny the motions to exclude and strike the evidence of the average sales price of the Montgomery Ward Company assemblage and of the prices for which they and the developers across the street from the subject properties (Universal Square) were offering to lease property.

The City argues (1) that the evidence was admissible for the very limited purpose of showing the rate of market absorption of commercial properties in the area, and (2) any error in refusing to strike the testimony so given was minimal under the circumstances and was not of sufficient gravity to warrant reversal.

The requisite elements of comparability as bearing upon the determination of value of property are as follows: ''When relevant to the determination of the value of property, a witness may take into account as a basis for his opinion the price and other terms and circumstances of any sale or contract to sell and purchase comparable property if the sale or contract was freely made in good faith within a reasonable time before

or after the date of valuation. In order to be considered comparable, the sale or contract must have been made sufficiently near in time to the date of valuation, and the property sold must be located sufficiently near the property being valued, and must be sufficiently alike in respect to character, size, situation, useability, and improvements, to make it clear that the property sold and the property being valued are comparable in value and that the price realized for the property sold may be fairly considered as shedding light on the value of the property being valued.'' (Evid. Code, § 816.) Similar safeguards are provided with respect to the terms of leases where the capitalization of income approach is used by the expert in supporting his opinion of value. (Evid. Code, § 819.)

It was held that the admission of testimony of the state's expert appraiser relating to listings of comparable property, admitted for the very limited purpose of showing the rate of absorption of properties in the area, being a collateral issue, did not constitute grounds for reversal. (*People* v. *Murray,* 172 Cal.App.2d 219, 229 [342 P.2d 485].)

It is well established that evidence of sales to fortify the opinion of the expert appraiser may not be received in evidence until comparability of the property to the property under condemnation is shown, to make it clear that the price realized for the other land may fairly be considered as shedding light on the value of the land in question. (*County of Los Angeles* v. *Faus,* 48 Cal.2d 672, 678 [312 P.2d 680]; *City of Monterey* v. *Hansen,* 214 Cal.App.2d 794, 797 [29 Cal.Rptr. 863].)

While the City's expert, Mr. Baker, in one part of his testimony, stated that he did not consider the Montgomery Ward Company assemblage as a comparable sale, he later stated that he considered Montgomery Ward Company to be an informed buyer, and that the information he had obtained concerning the property, as background information, would be such that an informed buyer would investigate and consider. No limitation was placed on this testimony by the court.

The jury in the case at bench had the duty to value the properties of the appellants from the standpoint of the informed buyer. It is common knowledge that Montgomery Ward Company is a large merchandising concern and it is reasonable to assume that it would purchase property for one of its outlets only after a careful investigation of market value in the area of the purchase. It is also reasonable to assume that the jurors would give careful consideration to

evidence of the price paid by such a purchaser as having an important bearing on the fair market value of property which they were to assess. There was no evidence of comparability of any of the parcels which made up the Montgomery Ward Company assemblage to the parcels under condemnation, except possibly their proximity to the subject property.

We are asked to weigh this error and its effect upon the verdict by reference to the prices at which claimed comparable parcels were sold, as shown by the testimony of the City's expert, some of which parcels were used by the defendants' expert, and by reference to prices at which claimed comparable parcels were sold, as shown by the defendants' expert, some of which were not used by the City's expert. These prices range from $4.79 per square foot in the high range to .83 cents per square foot in the low range. It would serve no useful purpose here to summarize the lengthy testimony of the experts relating to the sales data used by them and their reasons for using such data to formulate their respective opinions of fair market value of the subject properties. We are of the opinion that the error in admitting the testimony of the City's expert, Mr. Baker, hereinabove quoted, over the objection of the appellants and without limitation as to its applicability in the evidence had such an impact upon the jury's verdict as to result in a miscarriage of justice. (art. VI, § 13, Cal. Const.)

The judgment is reversed.

Cobey, Acting P. J., and Schweitzer, J., concurred.