[L. A. No. 29793. In Bank. Mar. 31, 1971.]

THE PEOPLE ex rel. DEPARTMENT OF PUBLIC WORKS,
Plaintiff and Appellant, v.
ROGER A. REARDON et al., Defendants and Respondents.

508

## COUNSEL

Harry S. Fenton, Joseph A. Montoya, H. Dean Stillwagon and Charles E. Spencer, Jr., for Plaintiff and Appellant.

Hansen & Dolle and Hodge L. Dolle, Jr., for Defendants and Respondents.

## OPINION

**TOBRINER, J.**—In this eminent domain proceeding the Department of Public Works condemned several parcels of defendants' property in connection with its construction of the Simi Freeway in Ventura County. The state now appeals solely from that portion of the trial judgment which awarded defendants $182,500, for the taking of a portion of the tract of land designated at trial as "Parcel 3." Parcel 3 covers a total area of 3.107 acres; of this, the state has condemned 2.06 acres.

Prior to the state's commencement of work on the freeway, the 2.06-acre portion housed several buildings connected with defendants' mortuary profession, as well as a four-bedroom residence. After the property had been definitely set for condemnation, these improvements were removed from the 2.06-acre area, and, by the time of trial, the owners had built new mortuary facilities and a new residence on the adjacent 1.1-acre plot which they retained. No significant disagreement developed between the parties as to the net depreciated value of the defendants' improvements; no question concerning that valuation has been raised on appeal.

Sharp differences did arise, however, over the proper valuation of the 2.06 acres of land that were taken. This property was partly zoned "Commercial Planned Development, (CPD) and partly "Residential Estate" (RE), and while the parties' respective appraisal witnesses generally agreed as to the value of the RE-zoned land, wide variations in valuation emerged

with respect to the CPD-zoned area. The two contentions of error, raised by the state on this appeal, relate directly to the valuation of the CPD-zoned portion.

The state first contends that the trial court committed several errors in its treatment of the issue of "project enhanced value." Prior to the initiation of the freeway construction project, defendants' commercial property occupied a site on a relatively minor secondary road; after the construction of the main part of the freeway, the 2.06-acre tract was immediately adjacent to a freeway "off-ramp."

The defendants' appraisal witness, in drawing his conclusion as to the value of the commercial zoned property, relied on several "comparable sales" of similar parcels located near freeway off-ramps. On cross-examination of this witness, the state sought to inquire into the extent that these "comparable sales" were "project enhanced," i.e., the extent to which the prices paid were influenced by the property's proximity to the freeway. The state contended that the sales price of such property substantially reflected the fact that the proposed freeway and its off-ramps had transformed these parcels into very valuable "gas station corners." To the extent that such incremental value affected the price, the state asserted, the sales prices could not properly be compared to the value of defendants' property, which, being taken for the highway project, could not be used as a "gas station corner." The trial court foreclosed all cross-examination to establish this fact, however, and, in a later instruction, appears to have permitted the jury, in determining the value of the 2.06-acre parcel, to have included the increase in value attributable to the freeway project. The state claims that this curtailment of its cross-examination and the court's subsequent instruction on project enhancement require reversal.

The state secondly contends that the trial court erred in finding that a transaction which it (the condemner) sought to introduce as a "comparable sale" was inadmissible because it involved an "exchange" of properties rather than a "cash transaction." The condemner asserts that this transaction would have been very helpful in the jury's task of evaluating the commercially zoned area, and that by keeping this evidence from the jury the court committed prejudicial error. We turn first to the issue of "project enhancement."

1. *The trial court erred in prohibiting plaintiff from inquiring into the possible "project enhanced" value reflected in sales which were received in evidence; under all the circumstances of the case, however, the error does not appear to have been prejudicial.*

Plaintiff's initial contention is, of course, related to the issue addressed

in the opinion in *Merced Irrigation Dist.* v. *Woolstenhulme* (1971) *ante,* p. 478 [93 Cal.Rptr. 833, 483 P.2d 1], which holds that enhanced value resulting from a proposed public improvement is a legitimate element of just compensation so long as the condemned land could reasonably be expected to be outside of the project. Under that principle, the alleged "project enhanced" sales, which plaintiff now claims are noncomparable, could conceivably reflect project enhanced value which defendants' land properly enjoyed; if that were the case, plaintiff's objections to those sales would obviously be groundless. (See *Merced Irrigation Dist.* v. *Woolstenhulme, supra, ante,* pp. 478, 499, fn. 14.) At the trial of this action, however, neither party directly addressed the factual question of whether the condemned land was ever expected to be outside of the project, or whether it was probable from the outset that the property would be included within the project, and thus we cannot be certain whether "enhancement value" could properly be included in defendants' award.

These factual uncertainties are not crucial to the instant appeal, however, for we have concluded that, even if we assume that defendants' property was expected to be taken for the freeway from the outset, and thus that defendants were entitled to no enhancement value as the condemner contends, the trial court's rulings of which plaintiff complains were not sufficiently prejudicial to require reversal. For purposes of the analysis undertaken below, we thus assume that the condemned land was known to be within the freeway project from its initial stages.

The condemner initially contends that the trial court erroneously foreclosed its cross-examination of defendants' appraisal witness, by precluding inquiry as to whether or not the price of a "comparable sale," relied on by the witness, had in fact been influenced by the freeway project. We must agree that the court's limitation of cross-examination in this fashion was improper.

■ In ruling on the admissibility of a proffered sale under Evidence Code section 816,[1] the trial court, of course, bears the initial responsibility

---

[1]Section 816 provides: "When relevant to the determination of the value of property, a witness may take into account as a basis for his opinion the price and other terms and circumstances of any sale or contract to sell and purchase comparable property if the sale or contract was freely made in good faith within a reasonable time before or after the date of valuation. In order to be considered comparable, the sale or contract must have been made sufficiently near in time to the date of valuation, and the property sold must be located sufficiently near the property being valued, and must be sufficiently alike in respect to character, size, situation, useability, and improvements, to make it clear that the property sold and the property being valued are comparable in value and that the price realized for the property sold may be fairly considered as shedding light on the value of the property being valued."

of determining whether or not the property sold is "sufficiently similar" to the condemned property to permit the sale to be received into evidence. (2) The court's decision to allow the introduction of the sale, however, is by no means a determination that the "sale property" is precisely equivalent to the condemned land, or that the "comparable sale" price represents the value of the land to be valued; the admission, instead only reflects a judgment that the comparable sale price "may be fairly considered as shedding light on the value of the land being valued." (Evid. Code, § 816.) (3) Once a sale is admitted into evidence, "[i]t is the universal rule . . . [that] the degree of comparability is a question of fact for the jury." (Cal. Law Revision Com., Recommendations Relating to Evidence in Eminent Domain Proceedings (1960) pp. A-50–A-51.)

Unless the court permits opposing counsel to inquire into the circumstances surrounding such a sale the jury will face an impossible task in determining the weight to be given to evidence of it. ■ Counsel must be given an opportunity to inquire into relevant differences that exist between the condemned land and the property which was the subject of the "comparable sale" or he is effectively precluded from demonstrating why a given sale may not be a reliable indicant of the value of the condemned land. (See, e.g., *City of San Luis Obispo* v. *Brizzolara* (1893) 100 Cal. 434, 437 [34 P. 1083], overruled on other grounds, *County of Los Angeles* v. *Faus* (1957) 48 Cal.2d 672, 680 [312 P.2d 680]; *Covina Union High School Dist.* v. *Jobe* (1959) 174 Cal.App.2d 340, 350-351 [345 P.2d 78]; cf. *Long Beach City H.S. Dist.* v. *Stewart* (1947) 30 Cal.2d 763, 773 [185 P.2d 585, 173 A.L.R. 249] ("It is a general rule that an opinion is worth no more than the reasons upon which it is based.").)

In some cases the cross-examination may relate to the disparity in size between the two parcels of land claimed to be "comparable" (see *People ex rel. Dept. Pub. Wks.* v. *Silveira* (1965) 236 Cal.App.2d 604, 623-624 [46 Cal.Rptr. 260]); in other cases, the inquiry may focus on differences in location, or on disparities in the dates of valuation. (See *San Bernardino County Flood Control Dist.* v. *Sweet* (1967) 255 Cal.App.2d 889, 905 [63 Cal.Rptr. 640].) In all of these situations, of course, the trial judge retains his traditional authority of prohibiting the examiner from ranging too far afield or from requiring the witness to delve into the realm of speculation (e.g. Evid. Code, § 352). The mere possibility that such examination may be abused, however, cannot justify an inflexible rule that precludes a party from exposing relevant distinctions between the offered "comparable sale" and the condemned land.

We can discern no reason why these general observations should not be equally applicable when the challenge to the "comparability" of a prof-

fered sale rests on a contention that the property sold differs from the condemned land by reason of "project enhancement." If, as the condemner asserts, a number of sales relied on by the landowners' appraiser involved property that had become valuable "gas station corners" by virtue of the proposed freeway, and if, as we have assumed, the condemned land did not properly share this "project enhancement" under the *Woolstenhulme* test, the state should have been permitted to explore the matter and to urge the jury to discount the importance of such sales when judging the appraiser's opinion. By curtailing all inquiry of this nature, the court may have precluded the state from exposing the most relevant differences between the "comparable sales" and the condemned land.

The court's error in this regard appears to have been compounded by the court's instructions to the jury. Although the court first advised the jury, at plaintiff's request, that "the property being taken may not be valued with reference to enhancement or depreciation in value . . . to said property arising solely and directly from the public improvement proposed by the plaintiff . . .," the judge thereafter instructed that "An increase in market activity or the prices paid for land in an area where there is general knowledge of a coming public improvement are *general benefits to which all property owners in the area, including defendants herein, are entitled.* Such general benefits are not to be deducted by you from your award of severance damages,[2] if any, or from *your determination of the just compensation to be paid for the parcel acquired.*"[3] (Italics added.)

If, as we have assumed, defendants' land was within the freeway project from the outset, these instructions improperly advised the jury that defendants were entitled to the "increase in . . . prices paid for land [because of the] . . . general knowledge of [the] coming public improvement. . . ." This error undoubtedly added to the court's initial mistake of foreclosing all cross-examination on "project enhancement," for, taken together, the two actions effectively permitted the jury to consider the enhanced property as property comparable to the land to be valued.

The remaining question is whether these errors were sufficiently preju-

---

[2] With respect to the treatment of "general benefits" in computing severance damages, see *Pierpont Inn, Inc.* v. *State of California* (1969) 70 Cal.2d 282, 295-296 [74 Cal.Rptr. 521, 449 P.2d 737].

[3] The distinction which these instructions attempts to draw between "enhancement . . . rising . . . directly from the public improvement" and the "increase . . . in prices [attributable to] . . . general knowledge of a coming public improvement" appears to approach the distinction we have endorsed in *Woolstenhulme*. Of course, neither the court nor the parties was aware of the *Woolstenhulme* test at the time of trial, however, and under the circumstances we do not believe that the jury could possibly have divined the proper standard from the obscure wording of these instructions.

dicial to require a reversal of the judgment. At trial the state's appraisal witness valued the CPD-zoned property at $70,270, or $1.25 per square foot, and the landowners' expert witness set the value of this portion of the property at $116,392, or $2 per square foot; the jury apparently established the value approximately at the midpoint between these two figures.[4]

In support of his $2 per square foot valuation, the defense expert submitted a series of comparable sales, involving prices ranging from $1.76 per square foot to $2.62 per square foot; plaintiff apparently only contends that the higher priced sales ($2.60 per sq. foot and $2.62 per sq. foot) reflected substantial project enhancement, and thus it is only those sales which plaintiff, with full cross-examination, may have been able to discredit as unreliable indicants of value. The effect of cross-examination upon these few sales, however, must lie in the realm of the speculative. That such cross-examination, as to this limited subject matter, would have changed the jury's decision is likewise speculative.

Furthermore, although the defense appraiser testified that he took the higher priced sales into account in computing his valuation, it is evident from his $2 per square foot valuation that he did not rely primarily on these sales. Moreover, the jury seems to have been less influenced by these sales, since it apparently valued the CPD-zoned property at even less than the $2 per square foot figure. ■ Under these circumstances, we have concluded that in the absence of the court's erroneous rulings in regard to "project enhancement" it is not reasonably probable that a result more favorable to the state would have been reached. Thus reversal on this ground is not appropriate. (Cal. Const., art. VI, § 13; *People* v. *Watson* (1956) 46 Cal.2d 818, 834-837 [299 P.2d 243].)

2. *The trial court did not abuse its discretion in limiting the cross-examination of a defense witness.*

The state raises a second issue on this appeal, unrelated to problems of "project enhancement." At trial the condemner's valuation witness testified that in evaluating the CPD-zoned area he took into consideration a recent sale of neighboring CPD-zoned property at only $1 a square foot ($300,000 total); the appraiser designated a Mr. Sailer as the seller of the property and Von's Market as the purchaser. When asked if the sale was a cash transaction the appraiser replied: "I believe my memory is that it was a cash transaction."

---

[4]The jury did not set a separate figure for the CPD-zoned property, but simply returned a total award for the entire land, including both the CPD and RE portions. The state's appraiser valued the entire parcel at $150,000; the landowners' witness valued it at $215,000, a difference of $65,000. The jury's award was $182,500, which splits the $65,000 difference precisely in half.

Near the close of the trial, defendant called Sailer as a rebuttal witness and he testified that while he was offered $300,000 ($1 per square foot) for the property, he had *not* received any cash in the transaction, but instead had obtained "a piece of property up north." On cross-examination of Sailer, the state inquired whether he and Von's had set a value for his property, but the trial court sustained a defense objection to this entire line of questioning as "improper cross-examination." Upon defense objection that the answers to the interrogatories were not known, the court also refused the state's counsel the opportunity to ask several questions of Sailer in order to make an offer of proof. (See Witkin, Cal. Evidence (2d ed. 1966) § 1311, p.1212.) When the court thereafter inquired whether counsel desired "a little discovery" on this matter, however, the state's attorney indicated that, in view of the fact that the litigation had reached its concluding stages, he did not feel discovery would be practicable.

From Sailer's testimony the jury was thus left with the impression that the "sale" had actually been no more than a straight exchange of property; the jury was thereafter instructed that if they did find such a "trade," they were to disregard the transaction.[5] The state claims that these rulings deprived it of the opportunity of proving property comparable to defendants' had been sold at only $1 per square foot.

The state does not challenge the general proposition that a transaction involving only an exchange of properties, with no monetary value fixed for either property, is not properly admissible as a "comparable sale" under section 816. (See *Jefferson Park Dist.* v. *Sowinski* (1929) 336 Ill. 390, 393 [168 N.E. 370, 371]; 5 Nichols on Eminent Domain (rev. 3d ed. 1969) § 21.3[1], pp. 21-37; 1 Orgel on Valuation Under Eminent Domain (2d ed. 1953) § 140, pp. 593-594.) The introduction of comparable sales serves the purpose of giving the jury the benefit of some "objective" market evaluation against which to check an appraiser's valuation (see *Epstein* v. *Boston Housing Authority* (1944) 317 Mass. 297, 301 [58 N.E.2d 135, 138]); if the "comparable transaction" lacks an objectively determinable market price, and the appraiser himself must estimate the "price" in monetary terms, the purpose of this section is obviously defeated. Moreover, Evidence Code section 822, subdivision (d) specifically precludes an

---

[5]The relevant instructions read: "In considering prices paid for comparable properties in weighing the testimony of the experts you must disregard any transaction in which the purchase price consisted of an exchange of other real property.

"You have heard testimony from witnesses for both parties regarding the price paid for property purchased by Von's Markets and sold by one Sailer. If you find that in trade Mr. Sailer received other real property in consideration for the transfer of his property to Von's Markets, you are to disregard this transaction as it would not be a proper basis upon which an expert can form an opinion of value of the subject property."

appraiser from rendering "[a]n opinion as to the value of any property . . . other than that being valued," and such a valuation would obviously be necessary in the case of a straight "exchange" of properties.

The state does maintain, however, that if it had been permitted on cross-examination of Sailer to expose all the circumstances involved in "Sale 5," it would have demonstrated that, in reality, the transaction more closely resembled a "sale" rather than a "trade," and thus that the jury could consider the $1 per square foot transaction in judging its appraiser's valuation opinion. In support of its position, plaintiff relies on a series of documents from the escrow on Sale 5, which it submitted to the trial court, on its motion for new trial, as "newly discovered evidence."

These documents, in our opinion, do reveal that the agreement between Von's and Sailer effectively set the "sales price" of the property at $300,000. The papers disclose that, in exchange for the property, Von's had agreed to purchase a piece of land of Sailer's choosing, but if Sailer could not find a suitable plot, Von's was to pay $300,000 for the property. In fact, Sailer found property worth $365,500[6] and Von's paid $300,500 toward the purchase price for this property while Sailer put up the balance. ■ If the jury had been permitted to hear this additional evidence, it might well have considered the Sailer transaction a "sale" rather than a "trade," and thus could have considered it in evaluating the state appraiser's valuation.

The question remains, however, whether the trial court abused its discretion in foreclosing cross-examination as it did. The state, it must be noted, itself introduced the evidence of the Sailer transaction and sought to rely on the transaction as a "comparable sale"; as such, it had the responsibility of ascertaining the relevant facts surrounding the transaction and bore the burden of demonstrating that the transaction was a "comparable free market sale." (See *City of Rosemead* v. *Anderson* (1969) 270 Cal. App.2d 260, 266 [75 Cal.Rptr. 575].) Although the state may have met this burden initially when its appraiser testified that he "believed" the sale was a "cash transaction," nevertheless, when Sailer later testified that such characterization was not precisely the case, the court could have found that plaintiff's initial showing no longer remained sufficient. The state cannot properly claim "unfair surprise," as it attempts to do here, when the defendant uncovers an aspect of a transaction introduced and utilized by

---

[6]The suggestion has been made that this transaction could not constitute a "comparable sale" because the $365,000 property was located 200 miles from the condemned land and thus was not "sufficiently near" the property within the meaning of section 816. The property which was proffered as "comparable" to the condemned land, however, was not the $365,000 tract but the $300,000 parcel; it is the distance between the $300,000 parcel and the condemned land that is the relevant factor under section 816.

the state; to require the condemner to be thoroughly familiar with the "comparable sales" evidence upon which it relies does not impose a harsh requirement.

We recognize, of course, that the escrow documents now before the court do indicate that in many respects the Sailer transaction did approximate a "cash transaction." At the time of the cross-examination of Sailer, however, these documents had not been presented to the court, and even the state apparently did not know their content. Under these circumstances, the trial judge may reasonably have been concerned that the state sought only to obtain Sailer's own personal evaluation of his property's worth (see Evid. Code, § 822, subd. (d)), or to evoke some expression of an unconsummated negotiation offer (cf. Evid. Code, § 822, subd. (b)). Although it might have been preferable for the court to have permitted the state to attempt to develop some of the details of the Sailer transaction on *voir dire* of Mr. Sailer, we do not believe that the trial court's decision not to permit such questioning constitutes an abuse of discretion, particularly in view of the fact that this transaction was initially introduced into the case by the condemner itself.

In sum, we conclude that (1) although the court erred in foreclosing cross-examination as to project enhancement, such error was not prejudicial, and (2) the court did not abuse its discretion in curtailing one line of cross-examination of Mr. Sailer.

The judgment is affirmed.

Wright, C. J., McComb, J., Peters, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

Appellant's petition for a rehearing was denied April 29, 1971.